## BENSLEY *et al.* v. THE MOUNTAIN LAKE WATER COMPANY.

WHERE a bill avers that plaintiffs are the owners, and in possession of a tract of land, that defendants are insolvent and threaten to, and will, enter upon said land, and, by excavations, embankments, and diverting valuable springs and streams thereon, despoil it of the substance of the inheritance, and create a cloud upon plaintiffs' title, injunction lies.

Before private property, condemned for public use, can be taken from the owner, just compensation must be paid or secured to him.

Bensley *v.* The Mountain Lake Water Company.

A party, after procuring an order for the condemnation of property to public use, cannot lay by for four years without complying at all with those requirements of the proceeding which are of service to the owner, and then without notice, give effect to the previous and initiatory acts, through which he deraigns his title.

He who relics for title upon an extraordinary mode of acquisition given him, not by the will of the owner, expressed or implied, but against his will and by the mandate of the law, must show strict compliance with those statutory rules from which his title accrues.

No title, nor any right of possession, comes from the mere condemnation of private property for public use. Just compensation actually made, or secured according to law, is a condition precedent.

And such compensation must be made within a short period, or the privilege of taking the property under the condemnation will be deemed abandoned.

A *bona fide* purchaser of land, without notice of proceedings pending for its condemnation, at the time of purchase, no notice of *lis pendens* being filed, is not affected by the proceedings.

APPEAL from the Fourth District.

The case is sufficiently stated in the opinion of the Court.

The Court below first granted a preliminary injunction restraining the Sheriff from putting defendants in possession of the premises in dispute under the order or judgment of June 29th, 1857; and further ordering, that, if the Sheriff had already executed the writ of possession, the defendants should surrender the premises to plaintiffs.

The bill was filed on the 8th day of August; defendants entered on that day, and the injunction being served, the premises were surrendered to plaintiffs.

At the hearing the injunction was made perpetual, and the order of June 29th, 1857, vacated. The injunction issued against plaintiffs was dissolved. Defendant appeals.

*Thos. C. Hambly* and *Elisha Cook,* for Appellant.

1. The decree of Court adjudging to us the land was conclusive upon plaintiffs, because made on notice to them. Notice of this proceeding was made upon Holland, the Attorney on record of Emerson. Notice to one was notice to both tenants *in common.* (5 Esp. N. P. Cases, 196.) Notice to one is deemed evidence that it reached the other, (7 East. 155,) so that it must be inferred that his notice reached and included Bensley as well as Perkins. In such a case no *lis pendens* could legally be filed; this was not a proceeding which affected the "title," only the possession of the land; as it is only when the money is to be distributed that any question of ownership arises. The sole

counsel for the company on record was William G. Wood, and George C. Bates appeared there *adversely* to the company and for the city of San Francisco, and others who were claiming the land as against the Mountain Lake Water Company.  2. The dismissal order was made on the application of Bates, who had no authority, and had this order been made " in the matter of the Mountain Lake Water Company," instead of the other suit, it would not have discontinued it.   But, further, this order of the Judge, so far as discontinuance goes, is wholly extrajudicial and of no effect.   He had no right to embody any such language in the order.   3. The withdrawal of the money from Court would not dismiss the proceeding.   The possession of the property does not depend on the payment of the money.   The petition, survey, and report of the jury, give the possession, and not the payment of the money; therefore, the withdrawal of the money would not dismiss the proceeding ; to do that there must appear clearly the intention.  (*Bloodgood* v. *Mohawk & Hudson Railroad*, 14 Wend. 51; *Lovering* v. *The Philadelphia, Germantown, and Norristown Railroad*, 8 Watts & Serg. 459 ; *The Borough of Harrisburg* v. *Crangle*, 3 Watts & Serg. 460; Acts 1850, Secs. 17, 18; *Davidson* v. *The Boston and Maine Railroad Company*, 3 Cushing, 92.)   4. There never was any abandonment.   Abandonment is a question of fact for the jury.   (*Whitcomb* v. *Hoyt*, 6 Casey's Penn. 411; *Hurd* v. *Curtis*, 7 Met. 94 ; *Arnold* v. *Stevens*, 24 Pick. 106; 14 Eng. L. Eq. 413 ; *Heath* v. *Biddle*, 9 Barr, 273 ; *Wilson* v. *Watterson*, 4 Id. 214; *Pickard* v. *Bailey*, 6 Foster, N. H. 166.)   5. Injunction does not lie.  (14 Ohio, 353 ; 5 Geo. 576.)

*McDougal & Sharp*, also, for Appellant, said : If the effect of the order of December, 1853, be as contended for, it involves the following positions as true : 1st. That a Court, *of its own motion*, may dismiss proceedings of this kind without notice to the corporation, and without its being represented.  2d. That an order made in one suit or proceeding may operate an efficient order or judgment in another, between different parties.  3d. That an Attorney of an adversary interest may control the right to which he is antagonistic, by his own suggestion.

The question of abandonment is one of law.   There is no foundation here for this pretense, as the amount of work done and the one hundred and fifty-thousand dollars expended, show.

*Shafters, Park & Heydenfeldt*, for Respondent.

- There are four grounds, upon either or all of which the jurisdiction of a Court of Equity to grant the relief prayed for may be maintained :

1. Considering the plaintiffs as parties in possession, and further considering that the trespasses contemplated and threatened, were in legal contemplation irreparable in damages, and further, considering that the defendants were insolvent, we have a case within the equity jurisdiction. (*Merced Mining Company* v. *Fremont*, 7 Cal. 317, and the cases there cited.)

2. A Court of Equity has jurisdiction to restrain railway companies, and other like corporations, from entering upon and appropriating private lands, where there has not been a full and exact compliance with all the conditions made by the statute prerequisite to the right.   Here, it is true, the purpose was not to do irreparable damage by cutting down, or digging out and carrying away, things which are deemed of the substance of the inheritance ; but the purpose was more comprehensive, viz : the dispossession of the citizen from the whole of his inheritance, and a definitive appropriation of it by the corporation to its own use. (*Stone* v. *The Commercial Railway Company*, 18 Eng. Chan. 122 ; *Agas* v. *Regent's Canal Co.* Coop. 77 ; *River Dan Navigation Co.* v. *North Midland Railway Co.* 1 Railw. Cases, 153, 154, and in *Kemp* v. *London and Brighton Railway*, 1 Id. 504 ; *Bonaparte* v. *The Camden and Amboy R. R. Co.* 1 Bald. C. C. 232.)

3. The defendant company were claiming title to the land by virtue of certain judicial proceedings terminating in the judgment of June 29th, 1857.   The plaintiffs as owners and possessors for the period of more than four years, were in a position to test the validity of that judgment by proceedings in Chancery, and on the well understood principle of *quia timet*.

4. Courts of Equity have jurisdiction to set aside judgments and decrees where the Courts by which they were rendered have exceeded their jurisdiction, or where the judgment was procured by fraud upon the jurisdiction, or upon the *res*, if the proceeding was *in rem* or *quasi in rem*, or where it takes on the character of what is popularly known by the name of a " snap judgment." (Sto. Eq. Pl. Sec. 426.)

But the general question, in which all others center, is : Did

the company at the filing of the bill, have a then subsisting right of entry on the " Emerson Tract," derived from the judicial proceedings manifested in the pleadings and proofs, and under which alone the defendants claim ?

1. If the proceedings were regular so far as they went, then it is insisted that they were dismissed by the Court on the 17th of Dec. 1853, while they were yet incohate—the final " rule " spoken of in the Act of 1851, not at that time having been entered up and recorded in the office of the County Recorder.

2. But if the order of December 17th, 1853, did not work a dismissal of the proceedings in condemnation, then it is insisted that on that day, or thereafter, and before the final order, taken June 29th, 1857, the proceedings were voluntarily abandoned by the company.   The point is made that "abandonment" is a question of fact.   In some of the cases it has been so treated, and in others it has been treated as a question of law.   But there is a distinction that harmonizes all the cases, and which is in fact recognized by them all.   Where the evidence is in conflict, or if not in conflict, if the facts proved or given are ambiguous or indecisive, the question is for the jury under instructions. But if the facts proved or given are clear, uniform, and decisive, and are on the principles of right reason wholly incompatible with the truth of any other hypothesis than that of abandonment, the question then becomes one of legal conclusion.   But so far as this case is concerned, it matters little whether it is treated under the one aspect or the other.   We are in chancery, and the facts as well as the law are alike with the Court.  (*Green et al.* v. *Covillaud et als.* 10 Cal. 317.   On the general question of abandonment we cite *Van Loan* v. *Kline,* 10 John. 130; *French* v. *The Braintree Man. Co.* 23 Pick. 216; *Phillips* v. *Shaffer,* 5 Serg. &. R. 214 ; *Davis* v. *Butler,* 6 Cal. 510.)

3. That payment of the money assessed as damages for the land is a condition precedent to the right to take possession. (See Constitution of the State of California, Art. 1, Sec. 8 ; *San Francisco* v. *Scott,* 4 Cal. 114; *McCann* v. *Sierra Co.* 7 Id. 121; and *McCauley* v. *Weller,* 12 Id. 500.)

4. Or if the appropriation was successful and valid as against Emerson, then it is insisted that it is at least invalid as against the plaintiffs, his successors in the title, because they are *bona fide*

purchasers, without notice of the proceedings. It is charged in the complaint that there was no *lis pendens* filed, and the answer admits it. Emerson deeded the whole tract to Perkins, October 22d, 1860. Perkins conveyed two-thirds undivided to Bensley & Wright, May 16th, 1854. Both of these conveyances are alleged, and neither of them is denied. It is alleged that both deeds were on valuable consideration, and that averment is not denied. The matter of the Mountain Lake Water Company presented a case fully within the terms of the Practice Act, Sec. 27. The action "affected the title to real property," and no *lis pendens* having been filed, "the pendency of the action was not constructive notice to a subsequent incumbrancer or purchaser." No notice, in fact, is proved by the defense.

It is no answer to the objection now under consideration that the proceeding was *in rem*. It was an action "affecting the title to real estate," and, therefore, notice of *lis pendens* was due to third persons, even though it was *in rem*. But the argument proves too much, for all actions affecting the title to real property are *in rem* or *quasi in rem*—more *in rem* than they are *in personam*, and hardly *in personam* at all, except it be in the matter of damages and costs. The result of the reasoning is an utter nullification of the statute.

There may be a distinction taken, perhaps, between actions brought to vindicate an existing title to real estate (Practice Act, Sec. 263) and actions brought to perfect or transfer, or create such title, as in cases of foreclosure, partition, or condemnation, as here. In this last class of cases that notice of *lis pendens* is necessary in order that *bona fide* purchasers may be bound, there can be no question. True, there is no such provision in the Act of 1851, but it is found in the general rule. (Practice Act, Sec. 27.)

As to the objection that defendants were put in possession by the Sheriff under the order of August, 1857, and that the Court could not dispossess them by preliminary injunction, we say: 1. If the company had acquired the possession of the premises without judicial intervention, by their own unaided act, there might be doubt as to the power of a Court of Equity to turn them out by injunction, though there would be none as to its power to restrain them from committing waste or doing irre-

parable damage while in. But if we are right in our main positions, or right in any one of them, the first usurpation of judicial power is found in the order turning us out and putting the company in, and the victims in that first usurpation may well oppose it to the complainings of the alleged victims in the second. The possession, which they wrested from us under color of judicial proceedings, was of four years' standing. It had been peaceable; obtained by contract and conveyance from Emerson, whom the company have accredited as the owner of the title. 2. But there are cases in which a Court of Equity has power to compel a party to surrender possession of land. (*Champion* v. *Brown,* 6 Johns. Chan. 401.) It has it, or it has not. If it has it, and can turn us out now by virtue of it, even if the main question of right is with the plaintiffs, as defendants seem to claim, then the Court below had the same power by parity, and did not misapply it in forcing the company to surrender. But if the Court below did not have the power to expel the defendants, then this Court cannot have the power to expel the plaintiffs, but must leave the defendants to their remedy at law by ejectment. But should the Court enjoin us to evacuate, still if the Court holds that the plaintiffs are in the right on the principal questions presented by the case, the defendants should be restrained from committing any waste or damage on the premises. Besides, defendants should have appealed from the order. (Practice Act, Sec. 336.)

BALDWIN, J. delivered the opinion of the Court—TERRY, C. J. concurring.

The plaintiffs below, Respondents here, filed this bill, averring that they are the owners of certain lands, lying in San Francisco County, and situate at the mouth of Lobos Creek; that their title comes from one Emerson, who originally held the same, and that the plaintiffs have jointly possessed these lands since the 16th day of May, 1854; that the defendants, on the 29th day of June, 1857, obtained an order or judgment in the Fourth District Court, for the condemnation of these lands for the use of defendants. It is alleged that this judgment of condemnation is void, or should be so declared. The plaintiffs say that this judgment was irregular, and they assign the particular

grounds which, they say, avoid it. They aver that the proceedings were dismissed before this final order, thus assailed, was made; that they were voluntarily abandoned before this time; and the bill charges that the company threaten to enter under the order, and that they will, unless prevented, proceed to make excavations, embankments, and structures, on the land, and divert valuable springs and streams thereon, and that the company, and Scannell, the Sheriff, acting under the order, are insolvent. An injunction was granted, according to the prayer of the bill. The plaintiffs claim to be in possession, and they assert, as the natural consequences of the act they seek to enjoin, besides that a cloud upon their title is created, irreparable injury, by insolvent persons entering upon their property and despoiling it of the substance of the inheritance. They say that this is an irreparable damage, and that the remedial principle of equity jurisprudence, which makes this a matter of chancery jurisdiction, applies in full force to such a case. If this state of facts be maintained, there seems to be no doubt in reason and on authority of the propriety of the equitable interference. (See *Stone* v. *Commercial R. R. Co.* 18 Eng. Chan. 122; *Agas* v. *Regents' Canal Co.* Cooper, 77; *Bonaparte* v. *The Camden and Amboy R. R. Co.* 1 Bald. C. C. 232.)

It is necessary to a proper understanding of the questions involved in this issue, to consider the facts shown by the record. That the title to this property was in Emerson is conceded; for the defendants claim to have a right of entry by virtue of proceedings condemning it as his. The only question, then, is whether they have so proceeded as to subject it legally to their use or dominion. It is not necessary to question the right of the State Government, by virtue of its eminent domain, to take private property for public use in an authorized manner, nor, as a corollory or consequence of this general governmental power, to authorize its agents, whether corporate bodies or individual, to exercise this high sovereign prerogative. But it is just as indisputable that this right can only be exercised in pursuance of law, and in conformity to the Constitution. A citizen is entitled to hold his property free of any interference, except through the taxing power, from the government, or his fellow—subject to this one qualification—that when it is necessary for the pur-

poses of the public, it may be taken from him, provided the government so taking, or authorizing others to take it, shall make the owner just compensation; which must be paid or secured to him before he is deprived of his possession. This has been decided in many cases, and recently by this Court in the case of *McCauley* v. *Weller*.

The defendant in this case is a corporation organized under the Act of April 22, 1850, for the purpose of introducing fresh water into the city of San Francisco, from the Mountain Lake, situated in the vicinity of the city. One Merrifield was authorized by a city ordinance to introduce the waters of the Lake into the city for the period of twenty-five years ensuing the first day of January, 1853, and by that day the work was to be done. Afterwards, Merrifield assigned his rights to this company. The city authorities extended the period for the completion of this work from time to time, until September, 1857. After this time, it is charged in the bill, and not denied, that the work, not having been completed, the Board of Supervisors passed a resolution declaring the privileges at an end.

On the 15th of June, 1853, the company filed a petition in the Fourth District Court, to condemn the lands in question. Commissioners were appointed, June 24, 1853, who reported August 23, 1853, as to the value of the lands—among others, that the land of Emerson was worth, with crops, etc. $3,000.

On December 25th, 1856, the company, without notice to the plaintiffs, procured an order confirming the report of 1853. On the 29th of June, 1857, without notice to plaintiffs, the company procured a final order or judgment condemning the lands, and directing that defendants should be let in possession on payment of the three thousand dollars. Emerson was once the owner and in possession of a part of the lands sought to be condemned—this being that in dispute here. Perkins and Bensley, claiming through Emerson, have possessed the land jointly since October, 1853.

Before this final judgment of confirmation, viz: on 17th of December, 1853, an order was entered on the minutes of the Fourth District Court, reciting, that it appeared to the Court, that said company did not intend further to proceed to obtain possession of the lands named in their petition, and dismissing the action; and it is charged in the bill, and not denied, that, on

the same day, the company withdrew the deposits of money theretofore made with the Clerk of the Court for the payment of the assessed damages, and, also, the collaterals deposited with the Clerk by the company, for the securing of the damages.

Some question is made as to the authority by which this order was made, and, also, whether it were made in or for this proceeding; but we regard these questions as not very important. It is very certain that the money paid into Court as damages for the land comprehended these three thousand dollars assessed by the Commissioners, for Emerson's land. It is just as certain that this money was received by the executive officer, or with the approbation of this officer of the company, and with knowledge of the source and authority of the repayment. Nearly four years passed without any action to restore the money, or further steps being taken to give effect to the appropriation of this property, or to perfect the title. The question then is, whether a party, knowing of an order purporting to show an abandonment of proceedings, for the condemnation of property, and giving effect to it by receiving benefits and advantages accruing through such order, can, after the lapse of several years, be heard to allege that such an order was unauthorized, and the fact it recites untrue. But to stear clear of any disputed facts, the broader question may be made, whether the party, after procuring an order for the condemnation of property, to public use, can lay by for four years without complying at all with those requirements of the proceeding which are of service to the owner, and then without notice give effect to the previous and initiatory acts, through which he deraigns his title. This statutory power of taking property from the owner, without his consent, is one of the most delicate exercises of governmental authority. It is to be watched and guarded with jealous scrutiny. Important as the power may be to the government, the inviolable sanctity, which all free constitutions attach to the rights of property of the citizen, constrains the strict observance of the substantial provisions of law, which are prescribed as modes of the exercise of the power, and to protect it from abuse. All statutory modes of divesting titles are strictly construed, and to be strictly followed. He who relies for a title upon an extraordinary mode of acquisition given him, not by the will of the

owner, expressed or implied, but against his will and by the mandate of the law, must show for his warrant a strict compliance with those statutory rules from which his title accrues. Accordingly, all tax laws are construed rigidly, and must be closely followed, in order to divest or vest title. It would be strange if a petty charge could not be laid upon property for its protection and the support of government, without strictly following the laws imposing the tax, and yet the whole property be taken by the law in fee and forever, without this same strict observance of legal rules. No Court has gone further than this in the doctrines asserted upon this subject, giving this salutary protection to private rights. (See 1 Cal. 4; *McCauley* v. *Weller,* 7 Ib.)

It is a mistake to suppose that any title comes from mere appropriation of another's property, or from the taking of the legal proceeding to condemn it. The Constitution is express. Private property shall not *be taken* for public use without compensation. The compensation precedes the title. The compensation must be adequate. But adequate—when? Of course, when the property *is so taken.* *The right* to take on the terms adjudicated—which is a compulsory statutory sale—accrues from the legal proceedings—the petition—the report—the confirmation; then the price becomes fixed. But no right of entry—much less a title—accrues so far. The party condemning, the representative of a State, is then *in a condition to be* a purchaser; the other party is in a situation of a vendor making an agreement of sale on condition precedent, but retaining his title and possession until payment. The property is rated according to its cash value; the money is expected to be paid at once or within a short period. It cannot be pretended that a party thus trading with another without this latter's consent, can also fix the terms of the payment, any more as to time of payment than as to price. If this were so, all an insolvent company, having this right, need do would be to condemn property prospectively valuable, and wait for years, until the property quadrupled its value, and then claim it under its first valuation. Even in respect to executory agreements, we held in *Green* v. *Covillaud,* (10 Cal.) as had been held before, that the party seeking an enforcement of a contract of sale of real estate must be prompt in

the compliance with *his* obligations, and that a delay of payment —in that case of twenty-two months—unexplained, was fatal to his right to enforce the contract.  The rule in such a case as that cannot be more strict than in this.

If we were to hold that by force of these proceedings, in 1853, this company had a right to wait until 1857, and then insist upon giving them effect, we must necessarily hold that the property condemned need not be paid for according to its valuation or real value in 1857, the time when really taken, but may, in effect, be paid for according to its assessed value in 1853, when proceedings were first instituted, and be paid for, not in cash, but on four years' credit, without security.  Nay, more, that it might be taken at the mere option of the company, without any sort of obligation on their part to take it, if they chose to decline, as, possibly, they might, if it deteriorated in value.  It would be a unilateral contract, binding one party, but not binding the other; and, translated into plain English, would mean : "If we (the company) choose, we will take your (Emerson's) land four years hence, by paying for it what is now assessed as its value.  You are to keep it for us, and not sell it, for all that time ; but if it declines in value or we do not choose to take it, we will not do so."  No sane man, if left to his volition, would make such a trade, and we think we have shown that the law is not so unjust or arbitrary as to make such a bargain for a citizen when it subjects him to its power.

The report and assessment of the Commissioners are only effectual to fix a price for the property, for the purpose of enabling the company to take it at that price at the time of, or within a short period after, the assessment and the confirmation of the report.  To entitle the company to take the property on those terms they must avail themselves of the privilege within the proper time.  The lapse of a reasonable time without availing themselves of the privilege was itself an abandonment of all claim to it.  To say the very least, when a year had passed and no offer made, the proceedings were effectually discontinued. The assessment had become *functus officio ;* just as if an offer had been made to the company by Emerson to take the property at a price agreed on, and no answer had been made by the company for that period.  The company had no right in 1857 to

revive the old initiatory proceedings of 1853, and claim to give effect to the attempted condemnation of the latter year. The payment of the money to the Clerk, and its subsequent withdrawal, left things where they were before the payment. A payment which, by the act of the party, is ineffectual, is, in law, no payment at all.

The argument which opposes these views is, that, by the mere fact of condemnation, a right of entry and possession accrued to this company without any payment or provision of payment, and several authorities from other States are cited to sustain this proposition. Perhaps it is a sufficient answer to state that, by the very terms of the order of 1857, possession was not to be taken except upon or until after payment. The authorities cited rest upon peculiar statutes or constitutional provisions of the States in which the cases were decided. There is nothing in the legislation of this State which gives any right of possession until the compensation is made, nor, if we may indicate our ideas of policy, should there be in any State. To all just ideas of individual rights there can be no doctrine more abhorrent than the notion that any free government had delegated to a private corporation a right to go upon the lands of a citizen and dispossess him of his freehold, and coolly inform him that after a while it will remunerate him for his property when it finds it convenient to pay him; but, in the meantime, he must content himself with being disseized and rely upon the faith and ability of the disseizor to make him reparation. (See 18 Wend. 9; 3 How. Miss. 240.)

2. It is said, too, that the company denies that Emerson has any title. If this be so, why was he made a party, and why are not only himself but his successors in interest sought to be affected by these proceedings? Why, at this late day, is the amount of damages assessed in 1853, offered to be paid to him or them? But is not possession in 1853, by Emerson, and subsequent deeds to, and possession under, them by his vendees, evidence of title as against those pretending to none, except through these proceedings against him?

We have held, upon the soundest authority, that the compensation must be first tendered or paid, or at least, satisfactorily provided, before any right to the property can be acquired, or

any right of possession destroyed.   And if isolated instances of departure from these conservative principles could be found, we should certainly regard them rather as warnings than as examples.   But we feel confident that no well considered case can be cited which holds that, under a statute similar to our own, a corporation may take possession of a man's property, and put him off with a mere promise or undertaking that it will afterwards pay him for it.   The authorities are all collected in the excellent work of Mr. Smith on Const. and Stat. Constr. 476, *et seq.* and the conclusion of the author is as we have given it.

3. Equally fatal is the other point—that the property had changed hands since the commencement of these proceedings; and that, so far as appears, these plaintiffs were purchasers without notice of any claim to the land on the part of the defendant, who had filed no *lis pendens*, and had by its conduct induced the idea that it had abandoned this attempted condemnation of the land.   A notice of the dismissal of the proceedings certainly was no notice of the existence of the claim.

Decree affirmed.

On petition for rehearing, the following opinion was delivered by BALDWIN, J.—TERRY, C. J. concurring:

The petition for a rehearing reviews several portions of the opinion, which constitute but little, if any, part of the controlling reasons of the conclusion.   We attached no importance to the action of the Board of Supervisors, though their action was stated as one of the facts in the case.

We supposed, that, as the Commissioners assessed to Emerson three thousand dollars, for land in his possession and injury to the crops, and these three thousand dollars were alleged to have been paid into Court, we might assume that the title was recognized to be in the tenant in possession, to or for whom compensation for the land was proposed to be made by the defendant.

When we spoke of notice to the plaintiffs, we spoke of legal notice—not of loose conversation on the street or elsewhere.   If any notice is required to give effect to judicial proceedings, it is notice in that authentic shape which binds parties to the result of a judicial inquiry.

We supposed, too, when a man deposits so large a sum as three thousand dollars in Court, that he is, of course, to be considered as aware of the fact that he has deposited it, and if it be withdrawn by order of Court that he knows of the withdrawal; and that it must be presumed, if nothing more is heard of the money for four years, when he makes another tender of the same sum, that he had received back the money first deposited; and, especially, if he does not deny a specific allegation that he *did* withdraw it, that this presumption is conclusive.

The main principle upon which we went in the opinion is this: that, after proceedings for a condemnation, which proceedings result in an assessment of damages, the money must, within a reasonable time, be paid or deposited; and if four years intervene before such an act is done, the proceedings must be held to be discontinued; and that a deposit does not mean merely formally putting the money into Court and then withdrawing it.

That a party is not bound to wait after a deposit and withdrawal of the money for years to see whether the party seeking to condemn it intends completing the process by which alone he can get title. This proposition is wholly independent of the question whether the value of the property rises or falls in the meantime; though, if it be stationary, the difference is the difference between money and four years's credit and the difference between an immediate forced sale on the terms the law annexes, and a sale to take place at the convenience of the person condemning the land.

We did not overlook the point that the injunction order restored the plaintiff to the possession.

This was irregular. But the case was *tried* on the merits, and the plaintiff *then*, according to our view of the case would have been entitled to an order of restitution of a possession improperly taken under color of these illegal proceedings.

This being so, the Court of Equity only erred as to the time of making this order; the whole record being before us in a chancery case, we would not reverse for an error which does no legal damage, merely because the Court did at first irregularly, what at last it would have been bound to do.

Rehearing denied.