## CENTRAL PACIFIC RAILROAD COMPANY, Appellant, v. JAMES PEARSON, Respondent.

### No. 2654; July 18, 1873.

**Eminent Domain —Time of Which Value of Land Ascertained.—** A person whose land is appropriated to a public use by the exercise of the right of eminent domain is entitled to be paid the value of the land as at the time when so taken, and not the value as at the time it was applied for.

**Eminent Domain—Compliance With Statute.**—When a railroad company invokes the exercise of the right of eminent domain for the purpose of devesting titles, it must pursue the statute substantially, not in some only, but in all, its provisions.

APPEAL from Sixth Judicial District, Sacramento County.

Robert Robinson for appellant; A. P. Catlin and J. H. McKune for respondent.

See Central Pac. R. R. Co. v. Pearson, 35 Cal. 247.

CROCKETT, J.—This is a proceeding to condemn lands for railroad purposes, and on the filing of the petition the court entered an order authorizing the petitioner to take possession of and use the land pending the proceedings on filing a bond with sureties as required by the statute. The bond was filed and the petitioner took possession of all the land, except three lots belonging to Pearson. Answers were filed by the land owners contesting the right to condemn the lands and denying the necessity of condemning them for railroad purposes. On hearing the petition the court entered an order adjudging that the lands were necessary and proper for the use of the petitioner and appointed commissioners to appraise their value. In December, 1866, the commissioners filed their report and assessment of damages, which were confirmed by the court, but on appeal to the supreme court the order confirming the report was reversed. Subsequently, in December, 1869, on notice and motion, the order previously made authorizing the petitioner to take possession of the land was vacated and set aside, so far as the same related to the three lots of Pearson before mentioned. The court then ordered the commissioners to proceed and ascertain the proper compensation and damages to be paid for the lands. In June, 1870, the commissioners filed their report, from which it appears that during the proceedings before them a contest arose between the petitioner on the one side and the land owners on the other as to the date to which the valuation should relate—the petitioner claiming that the property should be valued as of the 11th of October, 1866, when the proceedings were commenced, and the respondents that they were entitled to the present value. It was thereupon agreed that the commissioners should ascertain and report the value at each of

these periods, which was accordingly done. They reported that on the 11th of October, 1866, when the petition was filed, the aggregate value of the land sought to be condemned was fifteen thousand two hundred and twenty dollars, and in June, 1870 (the date of the report), it was twenty-three thousand three hundred and two dollars. The commissioners adopted the latter as the proper sum to be awarded as the value of the land, and the district court having concurred in this view of the law, the petitioner has appealed from the judgment and order confirming the report. The only question for our decision, therefore, is whether the court below erred in adopting the date of the report as the period to which the valuation should relate.

The solution of the question must depend upon what shall be determined to have been the time at which the land shall be deemed to have been taken for public use, for there can be no doubt whatever that a person whose property is appropriated to a public use by an exercise of the right of eminent domain is entitled to be paid the value of it at the time when it was so taken. This is too plain to need either argument or illustration. The only difficulty lies in determining at what time the property shall be deemed to have been "taken," in the sense of the constitution. On the one side it is contended that the land was "taken," in a legal and constitutional sense, when the petition was filed seeking to condemn it, and the court authorized the petitioner to take possession of and use it on giving a proper bond; or, if not then, certainly when the court heard the petition, decided the issues raised by the pleadings, and adjudged that the lands were necessary and proper for the use of the petitioner. It is argued that the right to use and appropriate the land then became complete in the petitioner, and nothing thereafter remained to be done except to ascertain its value at that time; the bond which had been given standing in the meantime as a substitute and security for the payment of the value when ascertained. On the other side, it is contended that under the constitution no one can be deprived of his title and the right to use and enjoy his property until its value has been ascertained and paid, and consequently, that the time to which the valuation relates must approximate as nearly to the payment as is consistent with the unavoidable delay which inter-

venes between the judgment and execution. We think it is clear that the time of filing the petition is not the time to which the valuation should relate. The land is not "taken" in any sense by the mere filing of a petition for condemnation which may be voluntarily dismissed by the petitioner on the next day. The filing of the petition creates no title in the petitioner, and, of itself, does not give a right of entry for the purposes of construction. Nor does the order of the court permitting an entry for the purposes of location and construction constitute a "taking" in a legal sense. It was so decided in Fox v. Western Pacific R. R. Co., 31 Cal. 555, in which Mr. Justice Sanderson, in delivering the opinion of the court, said: "Under no circumstances, then, can the entry be regarded as the taking, nor, indeed, can it be said in any legal sense that the land has been taken until the act has transpired which devests the title or subjects the land to the servitude. So long as the title remains in the individual, or the land remains uncharged by the servitude, there can have been no taking under conditions which, as already stated, preclude the commission of a trespass. The government and the individual really stand in the attitude of contracting parties, with this difference only, that the former has the power to compel the contract, if willing to pay what may be ascertained to be a fair price. Until the price has been ascertained the government is not in a position to close the bargain, and when it is ascertained, if the sum is not satisfactory, the government may withdraw. The government is under no obligation to take the land if the terms, when ascertained, are not satisfactory." If this be accepted as a correct exposition of the relations of the parties toward each other, it is evident that the mere entry under an order of the court, before the price is ascertained, can have wrought no change in the title and does not constitute a taking in a legal sense. And it is equally clear, we think, that the order adjudging that the lands were necessary and proper for the use of the petitioner did not have the effect to change the title or subject the land to the servitude. At that point of time the price had not been ascertained, and the government was "not in a position to close the bargain," and when ascertained, "if the sum is not satisfactory, the government may withdraw." It cannot be said with any propriety that the land had been "taken," so long

as the price had not been ascertained, and when the government would be under no obligation to take it even after the price was ascertained. The result at which Mr. Justice Sanderson arrived was, that "in the sense of the statute, the taking consists of a series of acts commencing with the entry for the purpose of location and terminating in the act of payment." Accepting this as the correct theory, it is clear that the taking would not be complete until payment was made.

Nor can the execution of the bond, as provided in section 34 of the statute, be deemed a payment in the sense in which that term is here used, if the government or its agent, the petitioner, would be at liberty to decline to take the land when the price is ascertained. Under no circumstances could the land be deemed to be taken so long as the government was at liberty to decline to take it. But the statute provides that on obtaining the order authorizing it to take possession of the land, "the company shall pay a sufficient sum into court, or give security, to be approved by such court or judge, to pay the compensation in that behalf when ascertained."

If it be assumed that, on giving the bond, the company thereby undertook absolutely to pay the damages when assessed, and were not thereafter at liberty to retract if they should be dissatisfied with the amount, and if the bond should be deemed to be sufficient substitute for a payment in cash, nevertheless I think the valuation should relate to the time when it is made, and not to the date of the order adjudging that the land was necessary to the company for railroad purposes. This order was but one of a series of acts, all of which were essential to change the title and subject the land to the servitude. If no further steps had been taken after the order was obtained, and the proceeding had been dismissed for want of prosecution before the value of the land had been ascertained, it could not be pretended with any show of reason that the title had vested in the company, and that the respondents must lose their land without compensation. They were not actors in the proceeding, and no judgment by default could have been rendered against them if they had failed to appear. It was not incumbent on them to see that the proceedings were prosecuted with diligence, or at all; and yet, if the order adjudging that the land was necessary for

railroad purposes had the effect, proprio vigore, to devest the title and subject the land to the servitude, the petitioner certainly had no motive to take another step in the proceeding. On the contrary, its interest in that event would prompt it to inaction and to permit the proceeding to terminate by a failure to prosecute it. It would thereby have acquired the title to the land without paying for it, and the former owners would have lost it without being in any default. Such a result would be repugnant to every principle of justice. But it is well settled that proceedings by which a citizen is to be deprived of his property without his consent are strictissimi juris, and in cases of doubt all intendments are in favor of the private right. When a railroad corporation invokes the exercise of the right of eminent domain for the purpose of devesting titles, it must pursue the statute substantially, not in some only, but in all, its provisions. One of these provisions is that the value of the property shall be ascertained by commissioners to be appointed by the court, and that on confirming the report, the court or judge shall "certifiy the same thereon." Section 33 provides that the report and certificate, "upon the compensation named therein being paid," shall be recorded by the railroad company in the recorder's office of the county; and section 35 provides that upon the filing of the report for record, "and upon the payment or tender of the compensation and costs, as prescribed in this act, the real estate, or the right, title, or interest therein described in such report, shall be and become the property of said company for the purposes of its incorporation, and shall be deemed to be acquired for, and appropriated to, public use." This is an explicit declaration of the time at which, and the conditions on which, the title shall vest and the property shall be deemed to have been "taken" for public use, and it evidently was not intended that the order of the court, adjudging that the land was necessary for railroad purposes, should operate to devest the title. By the very letter of the statute the land was not taken for public use until its value had been ascertained by commissioners whose report had been confirmed, certified and recorded, and until payment had been made or tendered. These views are in accordance with those announced in Bensley v. Mountain Lake Water Co., 13 Cal. 316, 73 Am.

Dec. 575, and San Francisco & San Jose R. R. Co. v. Mahoney, 29 Cal. 116.

I am therefore of opinion that the court below properly decided that the valuation should relate to the time when the assessment of damages was made.

Judgment affirmed.

We concur: Rhodes, J.; Niles, J.; Belcher, J.