CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS
RAILWAY COMPANY v. BECK.

[No. 11,414.  Filed May 29, 1923.  Rehearing denied November
21, 1923.  Transfer denied April 2, 1926.]

1. VENDOR AND PURCHASER.—A railroad switch owned by an elevator company is not notice of an adjacent railroad's right to
the land on which the switch is located.  p. 387.

2. EMINENT DOMAIN.—Possession of land appropriated under
eminent domain proceedings is not authorized until after the
payment of damages to the owner.  p. 388.

3. PROPERTY.—Possession by a railroad of land on which a railroad switch is located is not evidence of the railroad's ownership of adjoining land not in its possession.  p. 388.

4. VENDOR AND PURCHASER.—Contract with railroad company for
construction of switch on company's land for coal-yard held not
to show railroad's ownership of adjacent land afterward purchased by owner of the coal-yard.—A contract with a railroad
company for the construction of a switch on its land leading to
a coal-yard owned and operated by the owner of adjoining
land, held not to show that the railroad company owned other
adjacent land afterward purchased by the owner of the coal-yard.  p. 388.

5. ESTOPPEL.—Reference in deeds to a railroad right of way as
then "occupied" held insufficient to give notice as to extent of
the railroad's right of way afterward acquired.—Deeds referring to a railroad right of way as then "located and occupied"
by a switch as one of the boundaries of the land described
therein, which made no mention of the right of way described
in an appropriation proceeding by the railroad, held insufficient to put the purchaser of adjoining land on inquiry as to
the extent of the railroad's right of way as acquired by the
appropriation proceeding.  p. 390.

6. QUIETING TITLE.—In action by a railroad company to quiet
title, evidence held not to show possession or acts of ownership.
—In an action by a railroad company to quiet its title to a
small tract of ground adjacent to its right of way, title to
which was acquired by its predecessor by condemnation pro-

ceedings transferred to another county on change of venue, the evidence was *held* sufficient to show that neither plaintiff nor its predecessor was ever in possession of the land or exercised any acts of ownership of it, and that there was nothing on record in the county where the land was situated to show that the plaintiff or its predecessor ever claimed to be the owner of the land. p. 390.

7. VENDOR AND PURCHASER.—*Evidence held sufficient to show that defendant in action to quiet title purchased the land for a valuable consideration without notice of plaintiff's claim or right thereto.*—In an action by a railroad company to quiet title to a strip of land adjacent to its right of way, evidence *held* sufficient to show that defendant purchased it for a valuable consideration without actual or constructive notice of the plaintiff's claim or right thereto. p. 391.

8. LIS PENDENS.—The purpose of the statute requiring *lis pendens* notice (§§345-352 Burns 1926) was to avoid the harsh applications of the common-law rule of *lis pendens.* p. 393.

9. LIS PENDENS.—*Lis pendens notice must be filed in condemnation proceeding in order to bind bona fide purchasers for value.*—Under the provisions of §§345, 347 Burns 1926, §§329, 335 Burns 1914, a *lis pendens* notice must be filed in a condemnation proceeding in order to bind purchasers for value without notice of the proceeding. p. 393.

10. LIS PENDENS.—*Condemnation proceeding not constructive notice to purchaser on change of venue, leaving nothing on file or showing land sought to be appropriated.*—A condemnation proceeding by a railroad company to appropriate certain land for railroad purposes, not being founded on any instrument executed by the record owner of the land or on any judgment of record in the county, did not constitute constructive notice to a subsequent purchaser, where the proceeding was transferred to another county on change of venue, leaving nothing on file or of record showing the land that the railroad company was seeking to appropriate. p. 395.

From Wabash Circuit Court; *J. F. Charles,* Special Judge.

Action by the Cleveland, Cincinnati, Chicago and St. Louis Railway Company against Francis M. Beck. From a judgment for defendant, the plaintiff appeals. *Affirmed.* By the second division.

*Frank L. Littleton, Forrest Chenoweth* and *Walter S. Bent,* for appellant.

*Warren G. Sayre, Alfred H. Plummer* and *Franklin W. Plummer,* for appellee.

McMAHAN, C. J.—Action by appellant in ejectment and to quiet title to certain real estate in the city of Wabash. From a judgment in favor of appellee, appellant appeals and contends that the decision is not sustained by sufficient evidence.

The land in question was formerly a part of the bed of the Wabash and Erie canal, is located forty feet south of Canal street and in what would have been Huntington street if it had been extended across the canal. Huntington street runs north and south and is sixty-six feet wide. South of Canal street, opposite the end of Huntington street there is an open unplatted piece of ground about 125 or 130 feet in length east and west and running south to the canal. If Huntington street had been laid out south of Canal street to the canal, to the same width that it was north of Canal street, it would have occupied the east half of this space which, as appears from the plat, was dedicated to the public, and it was evidently used by the public in order to reach the canal, it being marked on one of the exhibits introduced in evidence by appellant "old dock space."

In February, 1904, appellee with others purchased from the Wabash Hydraulic Company, the then owner, what, in a general way, may be described as the north fifty-eight feet of the main line of the old canal, between Wabash street and the west line of Huntington street extended south across the canal, and being immediately north of a twenty foot right of way owned by appellant, on which is located what is known as the "Strawboard switch." Wabash street is the first street west

of Huntington, and on the south side of Canal street opposite the south end of Wabash street, there is an open space about 175 or 180 feet long lying between the canal and Canal street, and it is inferable from the evidence that this too was left open to the public as "dock space," it being so marked on a plat introduced in evidence by appellant. The lots between the canal and Canal street and between the dock spaces at the foot of Huntington and Wabash streets, were, in 1904, and ever since have been, used for business purposes, a woolen mill being on the west and a grain elevator being on the east. When appellee purchased the above described property in 1904, there was located thereon what is known as the "King Grain Company track" or switch from appellant's main line and running west to the woolen mill and immediately south of the grain elevator. The evidence does not disclose when or by whom this switch was built. It was there in 1886. The ground west of the east line of Huntington street, on which it was located, was low, and was a part of the bed of the old canal. Repairs were made on it by employees of the railroad. The evidence also shows that the employees of the railroad made repairs on switches owned by private individuals as well as on those owned by the railroad. In 1904, soon after appellee purchased this land, he made arrangements with appellant whereby appellant constructed a switch from the Strawboard switch along the south line thereof, part of the same being on the land so purchased in 1904 and part of it being on that part of appellant's right of way on which the Strawboard switch is located. Immediately north of the switch so built for appellee, he erected coal sheds extending west from the east line of the land so purchased in 1904. He also built a fence along the north line of this tract next to the elevator and enclosed it

at the east end with a fence and gates.   One of these gates was placed across the switch running to the elevator and another between this switch and the east end of the coal sheds so that when it became necessary to place or remove a car from this switch or to get into the coal yard, it was necessary to open a gate.   In 1904, when this land was purchased by appellee, the space immediately to the east, extending to the east line of Huntington street if extended, and the space north to Canal street, heretofore referred to as "old dock space," were open and used as an outlet to Canal street.   At the time of this purchase, that part just referred to as lying east of said strip constituted part of the canal bed and was so low that it could not be used until it was filled in and the surface raised from two to four feet.

In March, 1906, the common council of the city of Wabash began proceedings to open Huntington street south from Canal street across the canal to a street south thereof.   Such proceedings were had in this matter as resulted in Huntington street being opened from Canal street in a southeasterly direction, leaving a tract of land lying immediately east of the land purchased by appellee in 1904, and west of Huntington street as extended and opened in 1906.   While said proceedings to open and extend said street across the canal were pending, viz.: in May, 1906, appellee purchased the said tract immediately east of the tract purchased by him in 1904, and west of said Huntington street as extended, paying $300 therefor.   The north line of this tract is forty feet south of Canal street.   It is this tract of land that is involved in this action and it is described in appellant's complaint as beginning at the northeast corner of the tract purchased by appellee in 1904, then running east thirty-nine feet; thence south thirty de-

grees east to the north line of the right of way of appellant as "now located and occupied" by the Strawboard switch; thence west along the north line of said right of way sixty-one feet to the southeast corner of the land conveyed to appellee in 1904 and thence north fifty-eight feet to place of beginning.

Soon after appellee purchased this last tract of land, he enclosed it with fence and gates the same as the other tract, filled in the low places and used it that way for two or three years, when he extended the coal sheds east to Huntington street. He paid an assessment thereon of $200 for benefits on account of the opening of Huntington street. He paid for filling, for fences and for buildings, so that the total amount paid by him on account of the tract was $1,149. When appellee made his purchase in 1904, he believed Huntington street ran south across the canal and that his east line was the west line of the street.

In July, 1888, appellant's predecessor in title, the Cincinnati, Wabash and Michigan Railroad Company, began an action against appellee's grantor to condemn an eighty-foot strip of land extending from the east to the west line of Huntington street prolonged, and the twenty-foot strip on which the Strawboard switch is located, beginning at the west line of the eighty-foot strip and extending west 1,200 feet.

Appraisers having been appointed, they filed their report fixing the damages at $850. Exceptions were filed to this report by the landowner. The venue was changed to Kosciusko county in 1891, where a final judgment was rendered in June, 1902, increasing the damages to $1,700. The award of $850 allowed by the appraisers was paid to the clerk in March, 1889, and the increased amount was paid in September, 1902. After the payment of the $850, the railroad graded and

filled in the eighty-foot strip to the east line of Huntington street prolonged. Before paying the award, it took possession of the twenty-foot strip and placed the Strawboard switch thereon. No grading or filling was done on the land in controversy. Appellant's freight and passenger depots during all the time since 1904, and for a long time prior thereto, were located a short distance east of the land in controversy. Appellant's agents and employees at Wabash, it may be presumed, had full knowledge of the occupation of the land by appellee. Its superintendent knew when the fence and gates were constructed in 1904 and made no objection thereto. In fact, he made suggestions that the fence be set a little farther away from the King Grain Company switch.

No *lis pendens* notice was filed by the railroad when it filed its instrument of appropriation in 1888, or at any time thereafter. There was never any paper on file in Wabash county other than the instrument of appropriation and the report of the appraisers describing the land which the railroad company was asking to appropriate, and when the venue in said cause was changed to Kosciusko county in 1891, all the papers in the condemnation proceedings were sent to Kosciusko county, and thereafter there was no instrument or record of any kind in Wabash county giving any notice or information as to the lands sought to be condemned and no copy of the final judgment in Kosciusko county was filed or recorded in Wabash county until after this action was commenced.

Appellant contends that the proceedings to condemn were in strict compliance with the statute; that no notice of *lis pendens* was necessary and that the judgment of the circuit court of Wabash county appointing the appraisers to assess damages and the payment of the damages gave appellant complete title, subject only to

the right of the landowners to increase the damages on appeal; that such proceedings were notice to the world and that the presence of the Strawboard and elevator switches constituted notice that all the land between them belonged to the railroad.

Appellant also contends that the reference in appellee's deeds to the railroad right of way put him upon inquiry as to the extent of that right of way; that appellant's possession of part of the land was notice of its ownership of the entire tract; that appellee was not a purchaser in good faith and that the evidence is not sufficient to estop appellant from claiming title to the land in question.

Appellant contends that the evidence shows that immediately after the award of damages, it went into possession of the land condemned, laid and maintained tracks on the land involved in this action and used these tracks for handling its business as a common carrier, and that the presence of railroad tracks on the land, one on each side, constituted notice of ownership by appellant of all land between the two tracks. The tracks referred to by appellant evidently are the King Grain Company track and the Strawboard switch. The King Grain Company track was constructed and located on this land two years or more before the condemnation proceedings were commenced and there is evidence to justify us in saying this track was not owned by appellant but was a private track leading to the elevator. If this track was owned by the elevator people, its location on the land would be no notice of any right of appellant to the land on which it was located. If appellant or its predecessor in title constructed this track and owned the same, it would seem as if it might have introduced some evidence to substantiate that claim. Not having introduced any evidence on that subject it may be assumed it had none

at its command bearing upon that subject, or if it had, that such evidence would not support its claim to ownership of such track.

In so far as the Strawboard switch is concerned, no part of it is on the land in controversy. It lies entirely south of the land in question. As heretofore 2, 3. stated, the railroad took possession of the land on which this switch was constructed and built the switch thereon before the award was paid. Such possession was not warranted or authorized by the condemnation proceedings until after the payment of damages. There is no evidence that appellant or its predecessor in title ever took possession of any part of the land now in controversy. Possession of the land on which this switch is located is no evidence of the ownership of other land not in the possession of the railroad company.

Appellant calls attention to the fact that the deeds to the tracts of land purchased by appellee in 1904 and in 1906 mentioned the right of way of appellant 4. company as being the south boundary of said tracts and that appellee was thereby put upon such notice as to the location of such right of way as required him to make inquiry as to where such right of way was located, and that, if he had made inquiry, he would have discovered that appellant, by and through the condemnation proceedings, had appropriated all of the land so purchased by appellee in 1906. The evidence clearly shows that the land described in this instrument of appropriation lies south of Canal street, but just how far is not certain. In December, 1904, appellee and appellant entered into a written contract wherein appellant agreed to construct a switch for appellee's use in connection with his coal yard. This switch was to be connected with the north side of the "factory siding" (Strawboard switch) and to extend westwardly about

533 feet, all to be "on the land of first party" (appellant), as shown on a plat which was attached to the contract. There is nothing on this plat which in any way assists in locating the land then owned by appellee. Neither the location of the grain company track nor the Strawboard switch is indicated. There are certain figures on this plat which we assume indicate distances. If there is anything on this plat which can be taken as evidence of the location of the north line of appellant's right of way, such line is at least twenty-six feet south of such line as indicated by other evidence, including plats introduced by appellant. If we concede that the plat attached to the above mentioned contract indicates that appellant had an eighty-foot right of way, the north line of such right of way, according to this plat, would be sixty-six feet south of Canal street, while other plats introduced in evidence by appellant indicate that such north line is but forty feet south of Canal street. There is a memorandum on the plat attached to the contract, to the effect that 307.1 feet of the switch was to be on the land of appellee and balance on the land of appellant. There is nothing in the contract or on the plat attached thereto indicating, or from which it can be inferred, that any part of the proposed switch was to be located on the land described in the complaint and to which appellant seeks to have its title quieted. In fact, no part of that switch was or is on the land in controversy. The undisputed evidence is that such switch is from one to three feet south of this land and on that part of the right of way occupied by the Strawboard switch. As this switch was constructed, it ran slightly north of an east and west line, so that, at the west end, it is probably all on the land of appellee, while, at the east end of the tract then owned by appellee, the whole of the switch is on the twenty-foot strip on which the Strawboard switch is located. We find nothing in

this contract or on the plat attached thereto which even tends to prove that appellant was at that time the owner of any part of the land now in controversy or wherein appellee ever conceded appellant to be the owner of such tract.

The next contention of appellant is that the reference to appellant's right of way in the two deeds to appellee was sufficient to put appellee upon inquiry 5, 6. and to estop him from claiming the land in question, upon the theory that it was a part of appellant's right of way and that appellee, upon making inquiry, could have ascertained that fact. The right of way referred to in each of said deeds was the right of way of appellant as then "located and occupied" by Strawboard switch, the north line of said right of way being the south line of the land described in each of said deeds. The right of way referred to was the right of way as then "occupied" by the switch. No mention of or reference was made in either of said deeds to the right of way as described in the instrument of appropriation. There has never been any track in the vicinity of the land in question other than the Strawboard and King Grain Company switches. Of course, appellee knew that the King Grain Company track was located on both of the tracts of land purchased by him. He knew that the Strawboard switch was located south of said tracts so purchased by him. He probably knew that the grain company's switch did not belong to appellant. He testified that he knew the right of way used and occupied by the Strawboard switch was twenty feet wide. We find nothing in the deeds to appellee indicating that appellant had any claim to the land in dispute. Neither is there anything in either of these deeds to put him upon inquiry. The evidence, as before stated, is sufficient to support a finding that neither appellant nor its predecessor was ever in possession of

any part of the land now in controversy. When appellee purchased this land in 1906, the public records of Wabash county showed his immediate grantor was the owner of this land. There was at that time nothing of record in any of the public offices of the county indicating that appellant had any claim or title to the property. There is no evidence that appellant or its predecessor had ever exercised any act indicating ownership of it.

Appellee insists that he purchased the land in question for a valuable consideration, without notice, either actual or constructive, of any claim of appellant thereto, and the evidence is sufficient to sustain this contention. It is clear that appellant had no interest in or claim to the land in dispute prior to July, 1888, when its predecessor commenced proceedings against appellee's grantors to appropriate for railroad purposes certain lands which appellant claims include the land in controversy. The defendants named in said proceedings appeared, and appraisers were appointed to assess the damages. The appraisers made their report and the amount of the damages as fixed in the report was paid to the clerk of the Wabash Circuit Court in March, 1889, which was after the Strawboard switch had been constructed. Nothing more was done until two years later, when the proceedings were taken to Kosciusko county on change of venue, and was there pending without further action until June, 1902, when a final judgment was rendered on the exceptions to the appraisers' report, increasing the award to $1,700. This action to quiet title was commenced in August, 1911. It must be kept in mind that after the action to condemn was taken to Kosciusko county on change of venue in April, 1891, there was nothing of record in Wabash county, nor was there any paper or pleading in the condemnation proceeding on file in Wabash coun-

ty, nor was there any order-book entry in said cause in the clerk's office of Wabash county, from which it was possible to ascertain what lands the plaintiff therein was seeking to condemn. When appellee purchased the land in question in 1906, a search of the public records in Wabash county would not have shown the pendency of the condemnation proceeding, nor would such search have shown the pendency of any action affecting the title to the land in question. Appellant concedes that there was no record of any kind in Wabash county when appellee purchased the land in question showing that such land was included in and covered by the description of the land sought to be condemned. It, however, contends that appellee was bound to take notice of the description contained in the original instrument of appropriation although it had been transferred to and was on file in the clerk's office of Kosciusko county.

Appellee contends that the filing of the complaint or instrument of appropriation in the clerk's office in July, 1888, and the subsequent proceedings in said matter, in the absence of a *lis pendens* notice as provided for in §345 Burns 1926, §329 Burns 1914, was no notice to him of the pendency of such action. In reply to this contention, appellant insists that it was not required to file a *lis pendens* notice in connection with the complaint to condemn the land in question.

Said §345 provides that when any person shall have commenced a suit, whether by complaint or by cross-complaint, to enforce any lien upon, right to or interest in any real estate upon any claim not founded upon an instrument executed by the party having legal title to such real estate, as appears from the proper records of the county, and recorded as required by law, it shall be the duty of such person to file with the clerk of the circuit court of the county where the real estate is situated a written notice, stating the court, the names of

the parties to such suit, a description of the real estate
to be affected, and the nature of the lien, right or inter-
est sought to be enforced against such real estate, and
that such notice shall be recorded in the *lis pendens*
record.

Section 347 Burns 1926 provides that, "Until the
proper notices required by this act have been filed with
the proper clerk, the bringing of suits for the purposes
mentioned in section seventy-three (§345, *supra*),
\* \* \* shall not operate as constructive notice of the
pendency of such suits, \* \* \* or have any force or
effect as against *bona fide* purchasers."

The purpose of our statute requiring notice of *lis pen-
dens* was to avoid the harsh applications of the common-
law rule of *lis pendens*. The necessities of an
8, 9. action to appropriate land are not so great as to
call for the application of the common-law doctrine
of *lis pendens*, when we have a statute which provides a
method of giving notice and which is applicable. Ne-
cessity was the sole ground for the enforcement of the
rule of *lis pendens*. Bennett, Lis Pendens §§16, 17.
With the adoption of the statute providing for the giving
of notice of the pendency of an action, the necessity
which gave rise to the rule no longer exists. And it is
generally held that the adoption of statutes on this sub-
ject abrogates the common-law rule. Where such
statutes exist, notice of *lis pendens* must be filed in pro-
ceedings to condemn lands, unless the party has actual
notice of the suit and unless there be some constitutional
provision which will prevent the application of the stat-
ute. Bennett, Lis Pendens §321; *Bensley* v. *Mountain,
etc., Co.* (1859), 13 Cal. 319, 73 Am. Dec. 575.

*Pennington* v. *Martin* (1897), 146 Ind. 635, was an
action by Martin to quiet title. Pennington had sold
the land to his son James, who later transferred the
property to his wife. James died, after which the ap-

pellant commenced an action against the widow of James to enforce a vendor's lien. There was a decree in favor of the plaintiff, which was reversed on appeal. After this reversal, Martin purchased the land from the widow. A few days later, the plaintiff caused a *lis pendens* notice to be filed and recorded as provided by §345, *supra,* and, on final hearing, there was another decree rendered in favor of the plaintiff, after which Martin, who was not a party to the foreclosure proceedings, began an action against Pennington to quiet title. The court, after quoting from §§345, 347, *supra,* said: "The lien sought to be enforced by this appellant was one clearly within the provisions so requiring notice of the pending suit. What then was the effect of his failure to file the notice until after appellee had purchased the land, paid his money and received the conveyance? The answer of the statute is, that if the appellee was a *bona fide* purchaser, that failure shall defeat constructive notice of the pendency of the suit. The learned counsel for the appellant suggests that courts do not favor *lis pendens* statutes, and will not construe them broadly. If this were true we find no room for a construction which would eliminate, or even modify the strong words of the statute that until the notice is filed the bringing of the suit 'shall not operate as constructive notice.' Statutes of this class are numerous and have often been construed by the courts. The decisions are uniform in holding that 'the *lis pendens* acts limit the method of creating *lis pendens*— they abrogate the common law upon the subject, and if the statutory mode be not followed, there can be no *lis pendens* as to third parties.'"

For other authorities supporting the proposition that the statute abrogates the common-law rule of *lis pendens,* see *Gilman* v. *Carpenter* (1908), 22 S. D. 123, 115 N. W. 569; *Collingwood* v. *Brown* (1889), 106 N.

C. 362, 10 S. E. 868; *Buxton* v. *Sargent* (1898), 7 N. D. 503, 75 N. W. 811.

In *Arrington* v. *Arrington* (1894), 114 N. C. 151, 19 S. E. 351, cited in *Pennington* v. *Martin, supra,* it was held that when, on change of venue from the county, all the papers on file were removed from the county where the land was located, leaving nothing on file or of record, the *lis pendens* fails as to purchasers in good faith after the change of venue.

The action of the railroad company to appropriate the property was not founded upon any instrument executed by the party having the legal title to the real estate, as appeared from any of the records of the county where the land is situated. Neither was such action founded upon any judgment of record in such county, and, it is our judgment that the filing of the complaint or instrument of appropriation, together with the subsequent proceedings therein that were of record in Wabash county, did not amount to constructive notice. *First Nat. Bank* v. *Farmers, etc., Bank* (1908), 171 Ind. 323.

The evidence is sufficient to have warranted the trial court in finding that neither appellant nor its predecessor in title was ever in possession of the real estate in controversy and that appellee was a purchaser for value without any notice actual or constructive of any right or claim of appellant or its predecessor to said land, and is sufficient to sustain the finding of the court.

Judgment affirmed.